¶ 30. I agree with the majority that this case should be reversed. However, I dissent from the majority's affirmance of the chancellor's holding that the 1974 deed from Eldridge to Nettie was a forgery.
¶ 31. What I find particularly compelling from an evidentiary standpoint is a 1995 deed wherein Eldridge conveyed his undividedone-half interest in the subject property to his children. As I understand the record, there is no allegation that the 1995 deed was a forgery or that Eldridge did not knowingly execute and deliver the 1995 deed. In that deed, he acknowledged that he owned only an undivided one-half interest in the property which was the subject of the 1974 deed. Prior to the execution of the 1974 deed, Eldridge owned the entire tract. It is this 1974 deed that the chancellor found was a forgery. It is difficult for me to embrace the notion that in 1995 Eldridge would convey his undividedone-half interest in the property to his children if in fact he knew he owned the entire tract. Had he conveyed an undivided one-half interest of what he owned as opposed to his undivided one-half interest, his story in 1998 at the time of the divorce about his signature having been forged back in 1974 would have been more compelling. The use of the phrase " my undividedone-half interest " in the deed of conveyance suggests he was conveying all he owned as opposed to only half.
¶ 32. I fail to see why Eldridge is not estopped to claim more than a one-half interest in the property which was the subject of the 1974 conveyance. While I agree that under the holding in Perkinsv. Kerby, 308 So.2d 914 (Miss. 1975), Nettie cannot claim estoppel with respect to the 1974 deed since she is alleged to have forged that deed, I do not believe Nettie is estopped from claiming under the 1995 deed that Eldridge owns only a one-half interest in the property. There is no claim that either Nettie, Eldridge or anyone else committed any forgery or alteration with respect to the 1995 deed. The record reveals that Eldridge's trial counsel attempted to explain away the 1995 deed with this explanation:
 BY MR. GARRETT: First of all, I believe we can also establish that it is black letter law that a joint tenancy can be broken by the conveyance of its one-half interest. I believe it's Mr. King's position that he never intended to establish a joint tenancy. If the Court will reserve its ruling on this matter until after my redirect, I believe we can also establish that Mr. King has testified that Mrs. King left twice. The final departure date was February. And I believe we can show through his testimony that she left prior to the discussions of these two days and that these — this deed [1995 deed] was nothing more than an attempt on his part through the advice apparently of Charles Walker to break a joint tenancy in the event that they did not reconcile or they did not go forward with the marriage. And as far as that goes, we would show that he did delay two and a-half years before filing a complaint for divorce and that while Mr. Davis has cited a case where he is estopped from denying the existence of *Page 839 
the deed [the 1995 deed], he's just testified under Mr. Davis' cross examination, if I heard him correct when they asked him about his signature on defense Exhibit One [the 1974 deed], he said that's not my signature. He would certainly be entitled to explain why he did these things and whether or not one of the paper records reflect the actual intent of the parties and why he took such actions. (emphasis added)
¶ 33. If Eldridge owned the entire tract, why did he need a deed to sever the joint tenancy? It appears evident from the representation made by Eldridge's trial counsel — when Nettie's counsel was vehemently advocating the position that Eldridge was estopped from claiming more than a one-half interest because of the 1995 deed — that Eldridge knew in1995 that he did not own the entire tract. When Eldridge executed the 1995 deed, he did not claim that Nettie had forged his signature on the 1974 deed, yet the language used by him in the 1995 deed made it clear beyond equivocation that he owned only a half interest in the tract. He could not have executed the 1995 deed without his attention being called to the fact that the deed he was then executing indicated he owned only a one-half interest. In fact, it seems more likely that Eldridge's strategy then was to put his half of the property off limits to Nettie by conveying his one-half interest to his children. Three years later in divorce court, the evidence suggests that Eldridge had an additional strategy, take Nettie's half by claiming, without pleading, fraud.
¶ 34. I am not persuaded that the chancellor had before him clear and convincing evidence of fraud in the execution of the 1974 deed; therefore, I would reverse and render on this point.